UNITED STATES of America, Plaintiff,

v.

Helen KRAMER, et al., Defendant.

STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiff,

v.

ALMO ANTI–POLLUTION SERVICES CORP., et al., Defendants.

Civil Action Nos. 89–4340 (JBS), 90–4380 (JBS).

United States District Court, D. New Jersey.

Sept. 3, 1998.

As Amended Sept. 21, 1998.

Deborah M. Reyber, Senior Attorney, U.S. Department of Justice, Environment & Natural Resource Div. Washington, DC, Beverly Kolenberg, Assistant Regional Counsel,

U.S.Environmental Protection Agency, Office of Regional Counsel, New York, NY, for the U.S., Plaintiff.

Emerald Erickson Kuepper, Deputy Attorney General, State of New Jersey, William Brown, Dept. of Law & Public Safety, Trenton, NJ, for the State of New Jersey, Plaintiff.

William H. Hyatt, Jr., David W. Payne, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for direct Defendants.

James L. McKenna, Cherry Hill, NJ, John F. Strazzullo, Fairway Oaks, Pennsauken, NJ, for Third-Party Defendants G & S, Inc., G & S Co. and Thomas Gola.

Kenneth H. Mack, Fox, Rothschild, O'Brien & Frankel, Lawrenceville, NJ, for Third–Party Generator Defendants Group.

Jonathan Eron, Thatcher, Lonabaugh, Thatcher & Passarella, Runnemede, NJ, for Third–Party Transporter Defendants Group.

Robert B. McKinstry, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Third–Party Municipality Defendants Group.

Joseph A. Manfredi, Hartlab, Dotten, Connelly Terry, Townsend & Manfredi, Summit, NJ, for Defendant Albert J. Mitchell.

Glenn Harris, Levin & Hluchan, Voorhees, NJ, for Defendant Elf Atochem North America, Inc.

## MEMORANDUM OPINION

SIMANDLE, District Judge.

In connection with the remedying of conditions at the Helen Kramer Landfill Superfund Site in Mantua Township, New Jersey, the United States, on behalf of the U.S. Environmental Protection Agency and the State of New Jersey Department of Environmental Protection, have filed the present motions for entry of federal and state consent decrees resolving all direct claims of the governments in these multi-party hazardous waste cases arising under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11, et seq., (the "Spill Act"), and other state statutes. The proposed decrees were published for public comment in May, 1998, and no comments were received.

Under the proposed federal Consent Decree, the "Settling Defendants" (comprised of all viable direct defendants and most third-party defendants, numbering nearly 250 parties) will collectively pay the sum of $95 million plus interest to the United States over five years, in reimbursement of past response costs with respect to the Site. A subset of these parties, called the Settling Work Defendants,[1] will perform studies needed by EPA to perform its five-year reviews.

Under two parallel Consent Decrees with the State of New Jersey (the "State Consent Decree" and the "State Natural Resource Damages Consent Decree") the Settling Defendants will pay $9.77 million to the State plus interest accrued on the unpaid balance, reimbursing the State's past response costs at the site. The Settling Defendants will be obligated to continue operation and maintenance of the Site and to pay the cost of future response actions through May 12, 2023. The State NRD Consent Decree also requires the Settling Defendants to purchase and conserve a 151–acre parcel of wetlands and wooded uplands and to pay the State an additional $190,000 in compensation for natural resource damages. The federal Consent Decree also resolves natural resource damages claims on behalf of the federal natural resource trustees (the U.S. Fish and Wildlife Service and the National Oceanic and Atmospheric Administration) by incorporating the Settling Defendants' obligations to comply with the State Natural Resource Damages Consent Decree.

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The Helen Kramer Landfill in Mantua Township, New Jersey, was declared a feder-

---

1. The "Settling Work Defendants" are: Rohm & Haas Company, E.I. duPont de Nemours & Co., Elf–Atochem North America, Inc., Cytec Industries (on behalf of American Cyanamid Co.), Mobil Research and Development Corp., Chemical Leaman Tank Lines, Continental Can, and Carpenter Technology, Inc.

al Superfund site and placed upon the national priorities list by the U.S. Environmental Protection Agency pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* The United States undertook the Remedial Investigation and Feasibility Study, the Remedial Design, and remedy construction, which was largely completed in 1994. These remedial costs, together with enforcement costs and prejudgment interest to January, 1998, have amounted to approximately $123 million. The United States commenced suit in 1989 to recover all response and remedial costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and the government had by 1997 filed a Third Amended Complaint against the Direct Defendants alleged to be generators and transporters of hazardous substances deposited at the Landfill. After extensive litigation and settlement efforts, the United States and Direct Defendants reached agreement upon a proposed Consent Decree to resolve the United States' claims against all viable Direct Defendants and a wide majority of the Third–Party Defendants. The Consent Decree was lodged with the Court on May 8, 1998, was served upon all parties in the case including non-settlors, and was published for public comment on June 1, 1998, *see* 63 Fed. Reg. 29,754–55, consistent with Department of Justice regulations at 28 C.F.R. § 50.7. The United States received no comments.

Similarly, the State DEP commenced suit in 1989 and reached substantial agreement with a subgroup of the Settling Defendants to enable operation and maintenance functions at the Site to be transferred to these settling parties in 1997. The Site had been turned over to the NJDEP for oversight and maintenance on May 11, 1994. The State decrees were lodged with the court in May, 1998, circulated to all parties, and published through newspapers of general circulation seeking comment. The State received no comments. The Settling Defendants are re-

sponsible for all future response costs and all operation and maintenance endeavors subject to a comprehensive compliance schedule through May, 2023, when it is anticipated the remediation will be complete.

One party has objected to these proposed Consent Decrees, namely, third-party defendants Sun Company, Inc. (R & M) and Sun Ship, Inc. [hereafter "Sun"], which filed "tentative opposition" arguing that the court needs more information before it can undertake the fairness determination required by CERCLA, and inviting the court to protect Sun and other non-settlors by holding that the governments are limited to recovering the proportionate share of liability from any non-settling defendants and that third-party plaintiffs cannot seek to recover more than their fair share in the remaining contribution action. (Tentative Opp. Br. at 7–11.) In its objection filed seven days before the August 7, 1998 hearing date upon these motions, Sun seeks discovery of information underlying the settlement among the Settling Defendants, including the quantities of material and its nature and toxicity, that each settling party was assumed, for purposes of settlement, to have sent to the Site, as well as the settlement share to be paid by each settling party.

The Settling Work Defendants, also known as the "Offerors Group," strenuously oppose Sun's request, arguing that the settlement process leading to the allocation among Settling Defendants was robust and fair to all participants, including Sun, which assertedly had full access to the settlement process information which it now seeks.[2] The United States and State of New Jersey likewise assert that Sun has raised no meritorious objection, because details as to each party's settlement share are unnecessary to the assessment of the fairness of the overall settlement, and because Sun's potential liability to the United States is irrelevant and moot.[3]

---

**2.** See Affidavit of William H. Hyatt, Jr. (hereafter "Hyatt Aff.") Aug. 5, 1998, at ¶ 10.

**3.** The United States has also argued that Sun's objection is untimely, since Sun made no comment when the settlement was lodged in May and waited instead until the eve of the hearing in

August, citing *United States v. Charles George Trucking, Co.,* 823 F.2d 685, 690–91 (1st Cir.1987)(rejecting defendants' defenses to a penalty action for failure to comply with a CERCLA § 104(e) information request, holding parties waived their right to object when they ignored available avenue for redress). This argument

## II. *THE SETTLEMENT PROCESS*

To understand the proposed settlements, we start with the processes that led to them. When the contours of the federal and state cases became apparent, and after early dispositive motion practice directed at numerous affirmative defenses, *United States v. Kramer*, 757 F.Supp. 397 (D.N.J.1991), the parties expressed an interest in seeking to resolve the case. Because the construction of the EPA's remedy was ongoing through 1993, the total costs were unknown. The numerous potentially responsible parties ("PRP's") were aligned into Liaison Groups,[4] and representatives of these groups went about drafting a plan for a serious, far-reaching process of data gathering, analysis, and negotiation. This plan was stated in the Settlement Process Protocol, which creates the procedural vehicle for these settlement efforts among the PRP's. Because the ambitious efforts required by the Settlement Process Protocol would require dedication of great resources of time and money, the court agreed to temporarily stay the litigation. The Protocol was adopted by the Settlement Process Participants and was approved by the court, and the liaison counsel were elected to coordinate the process.[5]

The purpose of this process was to reach a fair and reasonable allocation of potential liability among some 300 potentially responsible parties in an ADR process which would create a reliable data base and apply reasonable assumptions regarding the comparative impact of each party's waste stream to the Helen Kramer Landfill. Pursuant to the requisites of the Protocol, all participants were required to respond to a detailed common questionnaire,[6] and responses were audited by the Settlement Process Committee and by the selected Waste Accountant, which was a large accounting firm. (Hyatt Aff. ¶ 5.) When an adequate data base had been achieved, after many months of efforts, the participants selected Clean Sites, Inc., an environmental litigation support firm specializing in dispute resolution, to serve as the Allocation Consultant. (Hyatt Aff. ¶ 6).

Pursuant to the Protocol, Clean Sites prepared an allocation plan, which was to be a non-binding "suggested method by which the costs of any such settlement [with the United States and the State] could be divided among the Participants." (Settlement Process Protocol, ¶ III.D.1.) Clean Sites considered criteria suggested by the participants as equitable factors relevant to the relative fault or culpability of the participants. (Hyatt Aff. ¶ 7) Clean Sites then articulated those criteria and applied them, attempting to replicate the result which would have occurred in an allocation of responsibility by the court after trial under CERCLA Section 113(f), 42 U.S.C. § 9613(f). (Hyatt Aff. ¶ 7.) Clean Sites issued a draft allocation report which was subject to advocacy and cross-fire within the settlement process, as one additional step toward a reliable and fair allocation. The final allocation was the "Clean Sites Report."

Under the Protocol, at least two-thirds of weighted voting power was required for the acceptance of the Report as a basis for further negotiations, but the vote fell just short. (Hyatt Aff. ¶ 9.) When no alternative alloca-

---

does not fit the present case, since the motions for court approval of the consent decrees were filed upon notice to all parties, and the objection was timely under that motion practice. ·

**4.** The Liaison Groups consisted of the Direct Defendants, the Third–Party Plaintiffs, the Third–Party Generators, the Third–Party Transporters and the Third–Party Municipalities. These groups were aligned for case management purposes, and each group selected its liaison counsel. Although over 300 parties were eventually joined in the case (of which 29 were direct defendants and the remainder were third-party defendants), the case could be managed for discovery and other pretrial purposes through the five liaison counsel and the attorneys for the United States and the State of New Jersey.

**5.** The United States and State of New Jersey were not participants in the Settlement Process Protocol. Instead, they were kept informed during frequent periodic conferences of all liaison counsel with the court.

**6.** The certified questionnaire answers were placed into a common repository, available for review by all participants. The data underwent a seemingly endless process of matching, verification, elimination of double-counting, and cross-checking against other related participants' reported data. This internal cross-checking was designed to elicit honest and complete information upon which to base an allocation.

tion plan emerged, the court concluded that sufficient time had been consumed in the allocation process without coming to an approved final plan, and the stay of litigation was lifted, including discovery and motion practice related to the recoverable costs and the liability of direct defendants.

The participants then decided to continue to use the Clean Sites Report as a basis for further negotiations among themselves, subject to the court's supervision by United States Magistrate Judge Joel B. Rosen, who served as Settlement Judge from 1996 to date.[7] The participants selected co-mediators [8] and, pursuant to Section IV of the Protocol, "enter[ed] into negotiations to allocate among themselves the cost to settle some or all of the claims associated in the [Federal and State cases]." (Hyatt Aff. ¶ 9.)

Meanwhile, negotiations toward a global settlement had gone forward between the United States and State of New Jersey and the representatives of various groups of PRP's. Court-supervised discussions attempted to develop a framework for compromise of the parties' positions in 1994 regarding the overall settlement demands.[9] The

State reached agreement-in-principle with a group of participants who would take over the operation and maintenance functions at the site in 1997, to be followed upon approval of the Consent Decree by payment of a sum of money which reduces somewhat the State's past costs and guarantees payment of future remedial and administrative costs. The United States reached tentative accord with the Offerors Group, which is the core group of defendants bearing the transaction costs of settlement and the risk of under-recovery.

According to counsel for the United States, "The Offerors Group offered to settle with the United States, based both on prior and anticipated settlements with other parties and on their willingness to pursue non-settlors in contribution litigation." Mem. of United States at 7.

The Clean Sites Report served as the basis for further negotiations between the Offerors Group and other Settlement Process Participants, resulting in a negotiated allocation among the Offerors Group and about 240 other participants.[10] This overall group be-

7. The use of a magistrate judge as a settlement judge in a CERCLA non-jury case serves to insulate the trial judge from direct settlement negotiations. Federal Judicial Center, *Manual for Complex Litigation, Third*, § 33.73 at 373 (1995).

8. The co-mediators are Linda Singer and Michael Lewis, of Washington, D.C., who worked with the Settlement Process Participants and with counsel for the United States to forge the individual settlements.

9. Although the global settlement discussions attempted to narrow the range of debate regarding dollars and terms, such a consensus did not develop in 1994 due to many uncertainties. See Case Management Order ("CMO") No. 11 (filed Oct. 17, 1994). These included whether the Settlement Protocol Process could reach a successful conclusion; whether all the costs incurred by the United States and State of New Jersey were recoverable; whether sufficient proof of nexus to the Landfill could be established; whether the remedy selected by the EPA was procedurally and substantively consistent with CERCLA; the contours of release and reopener rights; and other uncertainties coloring the various claims and defenses. My duties as a Settlement Judge, which had begun as Magistrate Judge assisting the late Chief Judge John F. Gerry and which continued as a District Judge through 1995, came to an end, since it was necessary to reopen plenary discovery, dispositive motion practice,

and trial preparation upon the claims of the United States. Various case management orders memorialized progress of plenary discovery on the United States' claims of liability against the direct defendants, as well as the issues of remedy selection and response costs. *See, e.g.*, CMO No. 12 (filed Feb. 6, 1995), CMO No. 14 (filed Mar. 27, 1995), CMO No. 15 (filed May 9, 1995), and CMO No. 16 (filed July 31, 1995), while the Clean Sites allocation process continued through 1996, see Supp. CMO No. 18 (filed Jan. 31, 1996). The various ongoing settlement initiatives and opportunities were described in CMO No. 18 (Second Amdt.) (filed Mar. 19, 1996), including the Settlement Protocol Process, the Global Settlement with State of New Jersey, Private Settlement Initiative among PRP's, EPA DeMinimis Process, and Global Settlement with United States, and my role as litigation judge was restated. *Id.* At the request of the settlement process participants, I appointed Magistrate Judge Rosen to perform additional duties as Settlement Judge, enumerated in CMO No. 19 (filed Nov. 14, 1996) and amendments thereto in 1997, while I continued to adjudicate the dispositive matters which arose on the litigation track.

10. A significant settlement was also achieved between the Offerors Group and a non-participant in the settlement process, namely, G & S Company, Inc., which was approved by the court after a hearing on July 31, 1998. The G & S settlement

came the Settling Defendants listed in Appendix A to the Consent Decree, all of which have submitted signature pages now attached to the original Consent Decree.

In addition to these proposed Consent Decrees with the federal and state governments, the United States anticipates concluding negotiations in the future for an amendment to this decree to provide for *de minimis* treatment of approximately 150 of the Settling Defendants. The main effect of such a settlement would be to remove the "re-opener" conditions on the United States' covenant not to sue with respect to such *de minimis* parties, pursuant to CERCLA § 122(g), 42 U.S.C. § 9722(g). Until such negotiations are concluded, such a *de minimis* component is not presently before this court.[11]

## III. *STANDARDS FOR APPROVAL*

### A. *Scope of Review*

■■■ The United States and the State of New Jersey seek judicial approval of the respective Consent Decrees they have negotiated with the Settling Defendants. A court should approve entry of a consent decree when it is satisfied that the decree is fair, reasonable, and consistent with the Constitution and the mandate of law. *United States v. Rohm and Haas Company*, 721 F.Supp. at

680; *United States v. Acton Corp.*, 733 F.Supp. 869, 871 (D.N.J.1990). The standard to be applied "is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objective of the governing statute." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir.1990); *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir.1992); *United States v. Akzo Coatings*, 949 F.2d 1409, 1424–26 (6th Cir.1991); *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir.1994); *United States v. Hercules, Inc.*, 961 F.2d 796, 800 (8th Cir.1992). Congress anticipated that the federal courts would apply standards with broad generality to determine whether the proposed decrees are both fair and faithful to the statute, taking into account the interests of the public at large, the settling parties and the non-settlers alike. H.R.Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin. News 3038, 3042.

The First Circuit noted the adaptability of this review standard to the different circumstances arising in CERCLA matters:

> [T]he concepts' amorphous quality is no accident or quirk of fate. We believe that Congress intended, first, that the judiciary take a broad view of proposed settlements,

is instructive of the manner in which the allocation process functioned. As outlined in the papers supporting approval of the Offerors/G & S settlement, and as restated in the Memorandum of the United States in Support of its Motion for Entry of the Consent Decree at 7–9, the share for G & S was determined as follows.

G & S and its principal, Thomas Gola, were not part of the allocation process under the Settlement Process Protocol and were not assigned shares in the Clean Sites Report. G & S was a broker arranging for disposal of the City of Philadelphia's wastes at the Kramer Landfill, as to which there was good evidence about nexus, quantity, and quality. The City of Philadelphia's self-disclosures resulted in an allocated share for the City of 9.92% (reflecting a 33% discount due to its status as a municipality). As a broker, G & S was assigned a half-share (4.96%), since G & S, not the City, dealt with the Kramers and devised the entire disposal scheme for an enormous amount of wastes. In addition, G & S was assigned the entirety of the municipal discount given to Philadelphia (restoring another 4.96%), and it was given a premium as a non-participant

in the initial global settlement amounting to 50%. The premium was justified because G & S was not accounted for in the Clean Sites allocation, adding uncertainty to a major component of liability, and because G & S should bear some additional responsibility for the substantial "orphan share" in this case, *see United States v. Kramer*, 953 F.Supp. 592 (D.N.J.1997), and because G & S allegedly made at least $4 million as a result of its brokering and hauling between the City and the Kramer Landfill. Mem. of United States at 8–9 & n.8.

When these percentages were applied to the costs of settling the claims of the United States and the State, the total G & S settlement amount was calculated as $17,707,200.

11. For procedures used in considering judicial approval of *de minimis* consent decree under CERCLA § 122(g), see the late Chief Judge Gerry's opinion approving the proposed settlement of *de minimis* parties' liability at the Lipari Landfill Superfund Site, *United States v. Rohm & Haas Co.*, 721 F.Supp. 666 (D.N.J.1989).

leaving highly technical issues and relatively petty inequities to the discourse between parties; and second, that the district courts treat each case on its own merits, recognizing the wide range of potential problems and possible solutions. When a court considers approval of a consent decree in a CERCLA case, there can be no easy-to-apply check list of relevant factors.

*Cannons,* 899 F.2d at 85–86.

■ Contrary to the view expressed by Sun as the objecting party, the court does not have the duty to reconstruct the settlement process and review the allocated shares with mathematical exactitude by delving into the data and reports upon which the settling parties based their negotiations. This approach was rejected by this court in *United States v. Rohm and Haas,* 721 F.Supp. at 680–81, where Judge Gerry wrote:

[The Court's task] is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of the liability approximately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolution.

Deference to the parties' judgments regarding these settlements is appropriate in this case. The policy favoring settlement, articulated in CERCLA, is especially strong where a consent decree has been negotiated by the Department of Justice on behalf of the EPA. *United States v. Cannons Eng'g Corp.,* 720 F.Supp. 1027, 1035 (D.Mass.1989), *aff'd,* 899 F.2d 79 (1st Cir.1990); *Akzo Coatings,* 949 F.2d at 1436; *Charles George Trucking,* 34 F.3d at 1085. The quality of the negotiators on behalf of the settlement process participants is likewise notable where, as here, "a crew of sophisticated players, with sharply conflicting interests, sit at the table" representing "so many affected parties, themselves knowledgeable." *Cannons,* 899 F.2d at 84. Applying these principles, we will consider Sun's objection and examine the overall fairness, reasonableness, and fidelity to law on a detailed basis momentarily.

## B. *Sun's Objection*

In addition to considering the overall fairness, reasonableness, and fidelity of the Consent Decrees, the court must consider Sun's specific objection. Sun argues that the decrees are unfair to non-settlers due to the so-called "secretive nature of the settlements" and the failure of the allocation report to adopt the evidence and inferences therefrom that had been urged by Sun in the settlement process. (Tentative Opp. of Sun Third–Party Defendants, at 4–5.) Sun questions the premises of the allocation report as applied to its waste stream, *id.,* which it believes did not go to the Helen Kramer Landfill at all, as stated by Sun's counsel at oral argument.

First, the court finds that the nature of the settlements was not "secretive." Sun, as a settlement process participant, had all the rights under the Settlement Process Protocol to inspect and review the underlying data from all participants, whether within or outside its suspected waste stream, and to receive and propose corrections to the Waste Accountant's Report and to the Draft and Final Allocation Reports. There is no dispute that the data and the premises applied to these were articulated to all participants by the allocator (Clean Sites). Sun received this information and analysis, and presumably it received feedback to its proposed revisions and redactions, too, all as called for in the Settlement Process Protocol. If one holds this process up against the template of pretrial discovery and adjudication at a non-jury trial, one finds a greater amount of disclosure, testing of the evidence, and repeated opportunity to correct errors of the allocator/adjudicator in the Settlement Protocol Process.

■ Sun's objection then boils down to its belief that the allocated share assigned to it through the process was too high, because Sun does not credit the underlying factual findings and presumptions. It is the nature of the allocation process that reasonable parties may disagree about the facts and assumptions underlying the assigned shares, especially where the Kramer Landfill records included no waste-in lists and many records

were lost or destroyed. Although Sun is the only party to object to the allocation process, one suspects many settling parties also may believe they are being asked to pay too much, given other plausible views of their potential liability.[12] It suffices to find that the process took all known facts into account, including Sun's proposed facts, weighed them, entertained Sun's objections, and gave Sun a plausible explanation for its proposed settlement allocation, all as revealed in Sun's own submissions. [Tentative Opp. of Sun, at 4–5 & Ex. 2 (Third–Party Plaintiffs' Supp. and Amended Interrogatory Responses, 7/10/98)]. Sun disagrees and exercises its right to refrain from settlement on the proposed terms. This is not prejudicial nor is it unfair to Sun.

If Sun is correct that it is not liable for any hazardous wastes discharged at the Helen Kramer Landfill, it will be entitled to judgment in its favor, either by summary judgment or after trial.[13] Moreover, even assuming Sun is correct that the allocators erred in determining Sun's share, such a circumstance does not mean that the overall settlement should be rejected by this court. It is the nature of a multi-party hazardous waste settlement allocation that the process seeks to predict the eventual interplay at trial of complicated facts and relationships based on incomplete or ambiguous data and other uncertainties. Not surprisingly, even reasonable predictions can be "wrong." To say this is not to indict the predictive process; rather, it is to place Sun's objection into perspective. As the only party voicing such an objection, Sun has not persuaded this court that the process was substantially flawed in its determinations.[14]

Finally, Sun objects to the form of the Consent Decrees because they do not contain the suballocation amounts for each Settling Defendant. The Consent Decrees instead contain the overall undertakings of the group of settling parties, including payments totaling $95 million plus interest in the United States Consent Decree, and $9.77 million and O & M expenses in the State Consent Decree, and $190,000 and other undertakings to conserve wetlands in the State Natural Resource Damages Decree. Neither the United States nor the State negotiated the shares of individual settlors. Instead, both plaintiffs engaged in the well-recognized (and practically imperative) practice of negotiating an overall settlement with a representative group of PRP's. Groupwide negotiation, through liaison representatives, is nothing new,[15] as other courts have recognized. See United States v. Charles George Trucking, 34 F.3d at 1081 (explicitly approving process resulting in consent decree which "did no more than assign payment responsibility to classes of [PRPs], leaving the question of allocation inter sese to the class members themselves"); United States v. Acton Corp., 733 F.Supp. at 873 (finding EPA's practice of negotiating with a representative group of PRPs, then having them resolve specific allocation shares among themselves, to be practical and reasonable); Kelley v. Thomas Solvent Co., 717 F.Supp. 507, 517 (W.D.Mich.1989) (entering consent decree and declining to order hearing and further discovery even though there was no actual allocation determination); In re Energy Coop., Inc., 173 B.R. 363, 368 (N.D.Ill.1994) ("requiring such precision as to the total extent of the harm caused and the role of each potentially responsible party is unwar-

---

12. In this sense, if most settling parties nonetheless believe they are paying more than their fair shares, Kramerland is a bit like Garrison Keillor's Lake Wobegon, "where all the children are above average."

13. This court will not preview any summary judgment motion practice by commenting further upon the information, such as deposition testimony, that Sun proffers in support of its objection to the settlement. To accept Sun's invitation would be to subject this motion to the exacting standards of summary judgment or trial far beyond the proper scope of review, supra, and in a manner antithetical to the conservation

of judicial and litigant resources that a CERCLA settlement is assigned to foster. United States v. Rohm and Haas, 721 F.Supp. at 684.

14. Sun also objects that the settlement is unfair to non-settlors because it exposes Sun and others to liability for too great a share of the unrecovered costs. The court will examine this issue below within the context of overall substantive fairness in Part III.C.1, below.

15. See Federal Judicial Center, Manual for Complex Litigation, Third, ¶ 33.73 at 373–381 (1995).

ranted.... We find no conceivable reason why we should require the environmental settlement agreement to delineate suballoca-tion...."); *United States v. Mid–State Dis-posal, Inc.*, 131 F.R.D. 573, 577 (W.D.Wis. 1990) ("It is not within this Court's purview to closely scrutinize the allocation of liability among the potentially responsible parties. The Court's core concern must be whether the proposed consent decree furthers the interest of CERCLA, and one of these inter-ests is to encourage settlement to promote the speedy resolution of harmful environ-mental concerns."); *United States v. Gen-Corp, Inc.*, 935 F.Supp. 928, 934–35 (N.D.Ohio 1996) (approving settlement which did not disclose for each party the settlement amount, the proportion of liability and the rationale).

A case cited by Sun, *United States v. Montrose Chem. Corp.*, 50 F.3d 741 (9th Cir. 1995), although reversing approval of a CERCLA settlement whose overall basis was not in the record below, did not speak to the issue of whether the court should require disclosure and evaluation of the individual participants' shares and the basis for them. In *Montrose*, the Ninth Circuit found that the district court had no information from which to conclude that the overall $45.7 mil-lion settlement figure was reasonable. The district court had failed to compare "the pro-portional relationship between the $45.7 mil-lion to be paid by the settling defendants and the government's current estimate of total damages...in light of the degree of liability attributable to the settling defendants." *Id.* at 747, citing *Charles George Trucking*, 34 F.3d at 1087.[16] The *Montrose* court's cita-tion to *Charles George Trucking* emphasizes the fact that *Montrose* was not critical of the district court's lack of analysis of individual settlement shares of the participants, for the *Charles George Trucking* Court said that the individual shares don't matter, because:

> After all, the ultimate measure of account-ability in any environmental case is the extent of the overall recovery, not the

amount of money paid by any individual defendant.

*Charles George Trucking*, 34 F.3d at 1086.

Disclosure and judicial analysis of the indi-vidual participants' shares is irrelevant in this case, where the proposed global settle-ment is not colored by individual party char-acteristics, such as inability to pay or sever-ability of harm of particular settlors. The United States and State of New Jersey have seen fit to entertain and accept the group-wide offer. That the individual party shares are in fact already in place within the group, and that each share is derived from the common data, analysis, and negotiation in the Settlement Protocol Process are not in dis-pute. Further, to require disclosure and ju-dicial examination of each party's proposed settlement share would be to compel the performance of an endless judicial task of micro-adjudication of the reasonableness of each of 250 parties' allocated settlement shares.[17] This examination could tend to-ward causing the precise delay and expendi-ture of judicial resources that the entry of a CERCLA consent decree is meant to avoid.

For these reasons, this court holds that the settling parties need not include in the Con-sent Decrees their individual monetary set-tlement shares, their bases of settlement al-location, or their individual proportions of site liability as determined by the settlement process among PRPs. It is sufficient that the terms, rationales, and bases of the Consent Decrees have been disclosed on a groupwide basis including all settling parties, from which the court may determine whether the group's proposed settlement is fair, reason-able, and faithful to CERCLA.

### C. *Analysis of the Consent Decrees*

#### 1. *Procedural and Substantive Fairness*

■ Assessing fairness of a CERCLA consent decree requires addressing both pro-cedural and substantive fairness. Procedural fairness considers the openness, candor, and bargaining balance of the settlement process.

---

16. This Opinion addresses precisely this issue in determining the reasonableness of the consent decrees in Part III.C.2, below.

17. The Clean Sites Report was available to Mag-istrate Judge Rosen, who used it in the settle-ment process, and he has retained the copy.

*Cannons*, 899 F.2d at 86. The procedural fairness analysis looks at the quality of "informed, arm's length bargaining." *United States v. Rohm and Haas*, 721 F.Supp. at 681, quoting *City of New York v. Exxon Corp.*, 697 F.Supp. 677, 692 (S.D.N.Y.1988).

■ As outlined above, the court holds that the Settlement Protocol Process, which led to the Clean Sites Report and negotiations through the professional mediation team under supervision of the Magistrate Judge, was procedurally fair. Settlement process participants, working with the court, designed and drafted the protocol, which defined the procedures and the participants' obligations and rights. A large majority of the PRPs opted in to the process and selected group liaison counsel to coordinate it. Pursuant to the Settlement Process Protocol, a national accounting firm supervised collection and compilation of data gathered through extensive questionnaire responses and document production. Parties' obligations to one another were enforced through the group liaison counsel, functioning as the Settlement Process Committee. The data were open to inspection and verification by all participants, to assure accuracy and completeness. Two rounds of corrections to this enormous [18] data base were conducted by the Waste Accountant to eliminate mistakes such as double-counting of wastes, underreporting, or misidentification of generators or haulers. This court oversaw the administration of the Settlement Process Protocol through frequent conference calls and occasional hearings as the reliable data base was constructed over a two-year period, during which the settlement process participants' litigation burdens were stayed.

Every participant had access to the court to register complaints if it appeared that the settlement process was conducted unfairly or otherwise in a manner inconsistent with the Settlement Process Protocol. Also, disputes as to the adequacy of responses were subject to resolution by a Special Master selected by the participants pursuant to the Protocol. Importantly, the process was entirely non-

binding and a participant was free to opt out as if it had never participated, subject only to paying its share of the settlement process fees incurred before its withdrawal.

The assembly of the reliable data base was a necessary but not a sufficient step toward completion of the process. Those data, as refined and set forth in the Waste Accountant's Report, were furnished to all participants and eventually to Clean Sites, Inc., which under the Protocol heard the participants' views upon the various equitable allocation factors to be applied. Clean Sites made adjustments for types of wastes and converted the various reported volumes (*e.g.*, tank loads, truck loads, barrels, tons, gallons) to a common currency, and began the allocation process by applying the developed allocation factors and assumptions. Again, the participants, whose interests throughout the process were generally adverse to each other, were afforded opportunities to present advocacy with respect not only to their own allocated shares, but also with respect to the shares allocated to other participants. This arm's length check-and-balance through informed advocacy by knowledgeable counsel was a feature that also assured procedural fairness. There is no dispute that Clean Sites, "after considering the equitable factors suggested by the Participants and selecting those equitable factors it deemed appropriate for consideration under the circumstances, based the Clean Sites Report on such equitable factors... [and] supplied those equitable factors, or attempted in good faith to apply those equitable factors, evenhandedly and consistently with respect to all the Participants.... Clean Sites, in preparing the Clean Sites Report, attempted, as best it could, to replicate the result which would have occurred had the Court allocated responsibility pursuant to Section 113(f) of [CERCLA]." (Hyatt Aff. ¶ 7.)

Finally, the mediation team assisted the participants in reaching closure within the allocation process. Every party voicing an opinion has praised the steadfast and fair efforts of the mediation team and the super-

---

**18.** The Settlement Process Committee reported to the court in 1994 that the computer generated "data dump" reflecting the corrected inputted

information in the waste accountant's format was a printout standing four feet high.

vision and coordination provided by Magistrate Judge Rosen. Counsel for the United States participated informally in the allocation settlement process through the mediators. The United States has received self-disclosure of information from various settling parties and knows that "the participating parties' shares in the allocation were generated based upon various 'nexus theories' tying the parties to the Site through direct shipments and assorted transporters, the quality of the evidence of actual disposal at the Kramer Landfill, the volume of waste shipped, and the relative toxicity of the waste." (Mem. of United States, at 7.) Further, the United States confirmed that "[t]he allocation report also gave the municipalities a one-third discount due to their status, and allocated unattributable wastes *pro rata* among all participating parties." *Id.*

■■■ The court also finds that the underlying allocation and overall settlement embraced in the Consent Decrees are substantively fair. Substantive fairness "goes to the fairness of the result, and requires that the settlement terms are 'based upon and roughly correlated with some acceptable measure of comparative fault....'" *United States v. Atlas Minerals and Chemicals*, 851 F.Supp. 639, 653 (E.D.Pa.1994), *quoting Cannons*, 899 F.2d at 86. This requires the government to demonstrate a "plausible explanation" for "measuring comparative fault and allocating liability" in the amount set forth in the Consent Decree. *Cannons*, 899 F.2d at 87. Substantive fairness includes the "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Id.* The United States and the State have met this burden.

The substantive fairness of the apportionment of liability derives from the carefulness with which it was determined in the arm's length bargaining process among many parties with adverse interests. There is a highly rational basis for the apportionment, articulated by the neutral evaluators and evidencing a successful good faith attempt to replicate the application of equitable factors to

the facts and assumptions of each participant's comparative fault. A most telling measure of substantive fairness is the fact that the vast majority of participants followed through and ratified the non-binding allocation, with the advice of knowledgeable and experienced counsel.

■■■ The substantive fairness also derives from the extensive hard bargaining between the governments and the PRP representatives, and more specifically the counsel for the Settling Work Defendants (or "Offerors"). Untold hours of bargaining between and among these experienced and creative counsel forged these Consent Decrees which provide a fair compromise of the parties' strongest and weakest positions;[19] where this settlement "is the product of informed, arms-length bargaining by the EPA, an agency with the technical expertise and the statutory mandate to enforce the nation's environmental protection laws, in conjunction with the Department of Justice ... a presumption of validity attaches to that agreement." *United States v. Rohm and Haas*, 721 F.Supp. at 681, *quoting City of New York v. Exxon Corp.*, 697 F.Supp. 677, 692 (S.D.N.Y. 1988). Here, the federal and state environmental experts, armed with thorough knowledge of one of the most intensely studied Superfund sites in the nation, having also conducted confirmatory discovery and information exchange and having the benefit of a completed remedy now in its second year of full operation, negotiated fairly and struck a substantially fair compromise.

■■■ The court has also considered whether the Consent Decrees are fair to non-settlors, as it is required to do. *United States v. Rohm and Haas Co.*, 721 F.Supp. at 680 ("effect of the proposed settlement on nonsettling parties" is a factor in approval of CERCLA consent decrees); *Akzo Coatings*, 949 F.2d at 1435; *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 522 (1st Cir.1996). Only one non-settlor, Sun, has expressed any objection on this ground. Sun is concerned that, in compromising their overall claims at 77 percent of the highest damages estimate,

---

**19.** The reasonableness of the Consent Decrees, measured in terms of the overall stakes and litigation risks and the bearing of future risks, is addressed in Part III.C.2, below.

the federal and state Consent Decrees leave a 23 percent uncollected share which may impose too great a burden on non-settling parties, in the event a non-settlor is found to be jointly and severally liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

The short answer is that Sun, like every remaining non-settlor, is not a direct defendant in the Section 107(a) claims of the United States or State, and it is therefore not liable to imposition of joint liability for this site. As this court previously held, CERCLA imposes joint and several liability for all response costs only upon direct defendants in Section 107(a) claims. *Kramer*, 757 F.Supp. at 414–16; *United States v. Kramer*, 953 F.Supp. 592, 599–600 (D.N.J.1997). Sun, like all non-settlors, will occupy the position of a contribution defendant upon the claims for contribution brought on behalf of the Offerors Group of Settling Defendants, pursuant to Section 113(f)(1) of CERCLA. The liability of contribution defendants under Section 113(f) may be several, but it may not be joint. *Id.* As a contribution defendant, Sun's liability must first be proved by the contribution plaintiffs, and, if liable, then a suitable allocation of Sun's share must be determined taking into account such "equitable factors as the court deems appropriate" under CERCLA § 113(f)(1), applying federal common law including the factors reasonably calculated to assess Sun's proportionate fault. *Kramer*, 757 F.Supp. at 412; *Kramer*, 953 F.Supp. at

597–601. It has also been determined that contribution defendants which are found liable may be called upon to bear an equitable share of the "orphan share" of past and future remedial and response costs in this case. *Kramer*, 953 F.Supp. at 601. The court declines to render an advisory opinion as to the future application of the other equitable factors that may apply to Sun if it is found liable for equitable contribution under CERCLA § 113(f)(1).[20]

Further, there is little or no likelihood that the present third-party defendants who are non-settlors can be joined as direct CERCLA defendants by the United States or by the State. It appears the statute of limitations period for doing so expired by October of 1997, assuming no further response costs are incurred in the future.[21] For all those reasons, the court finds that the Consent Decrees are fair to non-settlors, who will continue to enjoy the benefit of pretrial preparation, dispositive motion practice and, if necessary, trial in accordance with the Federal Rules of Civil Procedure and Federal Rules of Evidence.

### 2. *Reasonableness of Consent Decrees*

■ It has been held that "a district court's reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculation." *United States v. Char-*

---

**20.** That a non-settlor may be called upon to bear a disproportionate share of liability is also a possibility. See *Cannons*, 899 F.2d at 91; *GenCorp.*, 935 F.Supp. at 934; *Arizona v. Motorola, Inc.*, 139 F.R.D. 141, 145 (D.Ariz.1991) (noting, "This risk of disproportionate liability encourages parties to resolve their liability early, lest they be found responsible for amounts not paid by settling defendants"). If it is demonstrated in the contribution action that the group of PRPs represented by the Offeror Group settled early and took on the risks of under-compensation or no compensation by non-settlors who were shown to be liable at trial, then an equitable apportionment, such as through application of the so-called "Gore factors," 126 Cong. Rec. 26,779 & 26,781 (1980), is permitted by § 113(f)(1), *see, e.g., Kramer*, 953 F.Supp. at 598 & n. 5; *American Cyanamid Co. v. Nascolite Corp.*, 1995 WL 934871 at *7 (D.N.J.1995), *quoting Environmental Trans. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992); See also, *State of New Jersey, Dep't of Envtl. Protection and*

*Energy v. GEMS*, 821 F.Supp. 999, 1008 n. 15 (D.N.J.1993). One of the listed "Gore factors" on the non-exclusive listing is "the degree of cooperation by the parties with federal, state, or local officials..." which may include the equitable distinction between parties who chose to take the risk of settling early and others, if proved to be similarly situated, who did not. This issue is not here decided but awaits the allocation phase of trial.

**21.** Under this court's ruling in this case, *United States v. Kramer*, slip op. (D.N.J. Feb. 25, 1998), Section 113(g)(2) of CERCLA permits the United States to commence a subsequent action against new defendants until three years following the "completion of all response action" at the site. Assuming that the final recoverable expense was the additional work for cap repairs which concluded in October, 1994, the outermost boundary for the expiration of the limitations period would presently appear to have occurred in October of 1997.

*ter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996). To ascertain reasonableness, the court must make an independent determination of the technical adequacy of the work to be performed in cleansing and protecting the environment, whether the compensation to the public for response costs is satisfactory, and the risks and delays inherent in continuing the litigation. *Cannons*, 899 F.2d at 89–90.

■ Here, the technical adequacy of the remediation under this settlement is not in question.[22] The remedy has been completed, the long-term operation and maintenance (O & M) have commenced, and fifteen months' experience of O & M managed by the Settling Work Defendants has been underway and have earned the State's expression of overall satisfaction with their performance. The settlement requires this O & M by the settling parties to continue through May 12, 2023 and to undertake the five-year reviews including any studies reasonably required by EPA. The Consent Decrees also place the incentive for thorough and competent O & M squarely upon the settling parties who remain responsible for future response costs.

The court also finds the compensation to the public to be satisfactory. The United States will recover $95 million of a possible maximum of $123 million for Remedial Investigation and Feasibility Study, the remedial design, remedy construction, indirect and enforcement costs, and pre-judgment interest. This represents a 77% recovery of total costs. By way of compromise, the United States, through the upper levels of the U.S. Department of Justice and the U.S. Environmental Protection Agency, agreed to accept this sum, together with other covenants and undertakings by the settling parties, as appropriate to resolve all claims by the United States. This compromise appropriately takes into account such factors as the estimated volume and nature of the hazardous substances contributed to the Site by the settling parties and various "orphan" parties and the risks and expense of litigation necessary to pursue the case against the Direct Defendants through trial and judgment. (Mem. of United States at 6.)

Likewise, the State of New Jersey, through the Attorney General and the Department of Environmental Protection, assessed the monetary claims for § 107(a) costs and struck a similar balance by way of compromise, accepting the sum of $9.77 million of its pre-May 1997 costs and 100% of its future costs at the site. The complexity and risks of litigation and the value of an early settlement freeing state resources for O & M and remedial measures for use at other sites also spurred the compromise. (Mem. of State at 9.) The State's recovery likewise represents nearly 80% of the total past costs incurred by the State, while guaranteeing the continuation of operation and maintenance at the expense of the settling parties through the year 2023, together with paying the costs of future response actions through that time.

Damage to natural resources, while difficult to quantify, is also suitably addressed by these decrees. The New Jersey Department of Environmental Protection and the federal natural resource trustees in the U.S. Fish & Wildlife Service and the National Oceanic and Atmospheric Administration have studied the effect of the landfill upon its surroundings, especially Edwards Run and associated wetlands adjacent to the landfill which received some discharge of contaminated leachate and runoff. The effects on migratory waterfowl and fresh water fish, as well as migratory fish, have been examined, since Edwards Run feeds Mantua Creek, which is tidally influenced from the Delaware River. No serious or prolonged degradation toward these species of aquatic life have been noted, yet damage to the wetlands has been observed; hence, the State National Resource

---

**22.** Throughout the litigation, the government's remedy, as carried out by the Army Corps of Engineers through private contractors, was disputed by PRP's as "overkill," that is, designed and executed in an unreasonably expensive, non-cost effective manner. To the extent that the remedy is over-designed, this provides an extra measure of environmental protection. This court previously ruled that allegations that the United States' costs were unreasonable and excessive did not provide a defense to cost recovery, *United States v. Kramer*, 913 F.Supp. 848 (D.N.J.1995). Whether all claimed costs were consistent with the National Contingency Plan, however, has not been adjudicated.

Damage Consent Decree suitably requires the Settling Defendants to purchase wetlands and wooded uplands amounting to 151 acres, which will be preserved in perpetuity and conveyed by deed to the Township of West Deptford, together with payment of $190,000 in damages compensation to the State. This perpetual restriction upon valuable open land (which is itself costing the settling parties an additional sum of $968,614), consisting of a greater area than the affected wetlands, constitutes a gain for the public and a desirable resolution of the natural resource damage claims, and is consistent with N.J.S.A. 58:10–23.11g(a)(2). The federal Consent Decree requires compliance with the State's Decree as to these natural resources, consistent with Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607(a)(4)(C).

The settling parties are also paying a reasonable proportion of the overall liability when one considers the rather substantial fair share which would otherwise be payable by the owner/operator, Helen Kramer and her related entities, if she were not insolvent. The Kramer family were the active owners and operators of the Superfund site which has made their name somewhat infamous. Although many tons of hazardous waste at this site cannot be linked to any other party, and the origin of many other tons is in dispute, it can all be linked to the Kramers, yet they are unable to contribute to the settlement and have been voluntarily dismissed as a direct defendant. The 77% compromise thus also reflects the governmental recognition that it would be unfair to place this entire owner/operator share upon this subset of other PRPs whose "ideal" share of liability—"based on perfect knowledge of harm caused by [these parties] only, expressed as a proportion of the total costs of remediation at the site," *Kramer*, 953 F.Supp. at 595—is undoubtedly less than the compromise figure reached for this group. These parties are paying a disproportionate share of their liability measured in "ideal" terms, leavened, however, by the risk that their ultimate share of liability to the United States as direct defendants could be 100% by operation of joint and several liability under § 107(a) of CERCLA, as previously discussed. The monetary incentive to settle

litigation occurs at that point where the risks of litigation move the government and the settling parties away from their respective "ideal" positions of 100% recovery for the government versus only the proportionate "ideal" share for a PRP. That balance has been reasonably struck in these consent decrees.

The court further finds that the risks of litigation have been reasonably appreciated by the settling parties. The State of New Jersey aptly points out:

> The settlement is also reasonable in light of the complexity of the various liability cases to be made against various Defendants. The matters in dispute arise out of the operation of a landfill as far back as 30 years ago. Memories are inexact. Key witnesses have died. The documentary record is voluminous, complex, and in certain respects, not complete.

Mem. of State at 9.

The United States, too, has properly acknowledged the risks and costs of bringing the matter to trial, given the relative strengths and weaknesses of the parties' litigating positions. (Mem. of United States at 23.) For example, issues remained regarding the scope of review to be applied to post-ROD (record of decision) design changes by the EPA which may have significantly changed the approved remedy, as to which the direct defendants may have argued that such changes were not in accordance with law or were otherwise inconsistent with the National Contingency Plan. The court mentions, but does not rule on, some of the competing litigation positions, since such a ruling would require an adjudication of merits that can only be performed after discovery and trial, and not in the context of examining the reasonableness of a proposed consent decree; to do so would be at cross-purposes with CERCLA's goal of promoting compromise settlement. *Comerica Bank—Detroit v. Allen Indus.*, 769 F.Supp. 1408, 1411–12 (E.D.Mich.1991); *Arizona v. Motorola, Inc.*, 139 F.R.D. 141, 148 (D.Ariz.1991).

Finally, the court finds that the consent decrees are reasonable in placing the risks of future uncertainties upon the settling parties

rather than the governments. For example, the decrees are subject to "reopener" in the event EPA determines that previously unknown conditions or information indicate that the remedial actions are not protective of the human health or the environment. The Settling Defendants, however, have obtained the repose offered by contribution protection under § 113(f)(2) of CERCLA, by extinguishing the contribution claims of other parties against the Settling Defendants with respect to the Site.

Taking all these factors into account, the court has no hesitation in finding that these Consent Decrees are reasonable.

### 3. Consistency with CERCLA

The mandate of CERCLA is to remedy releases of hazardous substances into the human environment by imposing the burdens of remediation and of future risks upon parties liable for causing the harm, consistent with due process. Similarly, under the Spill Compensation and Control Act, the New Jersey Legislature has declared the State's policy "to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such substances...." N.J.S.A. 58:10–23.11a. These Consent Decrees will serve these public interests.

CERCLA encourages prompt and effective cleanup by responsible parties, while preserving both public finances and public health. The decrees largely replenish the CERCLA Superfund and the New Jersey Spill Fund, which constitute limited public resources, enabling the funds to be used at other sites. (*See, e.g.,* 131 Cong. Rec. H11,-070 (Dec. 5, 1985) (Statement of Rep. Florio); N.J.S.A. 58:10–23.11r.) Further, the Settling Defendants' agreement to perform the five year reviews likewise frees public money to be devoted to other sites where public health and the environment are threatened. The

settlements have also well served CERCLA's goal of reducing litigation and transaction costs, *see Cannons,* 899 F.2d at 90; *Rohm & Haas Co.,* 721 F.Supp. at 696. By simplifying the remaining litigation, which is reduced to a contribution recovery action by the settlors against a few remaining alleged PRPs, the public and the parties benefit from the "saving of time and money that results from the voluntary settlement of litigation." *Citizens for a Better Env't v. Gorsuch,* 718 F.2d 1117, 1126 (D.C.Cir.1983), *cert. denied sub nom. Union Carbide Corp. v. NRDC,* 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). Likewise, the savings of governmental litigation resources of experienced counsel and staff may now instead be devoted to other pressing cases where litigation is necessary.

The tangible benefits of containment, remediation, and restoration of a healthy environment for humans, animals, and plants, and the perpetual preservation of pristine lands in the vicinity, are the highest manifestation of the public benefits of these decrees, all of which this court finds to be faithful to the mandates of CERCLA.

### IV. CONCLUSION

After eight years of litigation and settlement processes, and after an independent review of the procedural and substantive fairness, reasonableness, and fidelity to the public interest embodied by the Federal Consent Decree, the State Consent Decree, and the State Natural Resource Damages Consent Decree, this court concludes that these decrees should be approved and entered.[23]

The appropriate Orders have been entered.

---

**23.** This court notes the eloquent concluding observation of counsel for the United States, who said in her Reply Memorandum at 12:

> Literally hundreds of thousands of words of advocacy have been submitted to this Court in this case over the years. Let the final words of the United States be these: the settlement is fair.

This court agrees.