**UNITED STATES of America,**
**Plaintiff,**

v.

**Eddie CANTRELL, et al., Defendants.**

**Nos. C–1–97–981, C–1–98–247.**

United States District Court,
S.D. Ohio,
Western Division.

March 23, 2000.

the divisibility of harm comes to light during the deferred discovery period on response costs.

Lois J. Schiffer, U.S. Dept. of Justice, Environ. Enforcement Section, Washington, DC, for plaintiff.

Christopher Richard Schraff, Porter, Wright, Morris & Arthur, Columbus, OH, for Mansbach Realty Co., Oak Hill Foundary & Mach. Works, CSX Transp., L R Landen Ray Daniels, defendants.

Frederic X. Shadley, Elizabeth Conkin, Benesch Friedlander Coplan & Aronoff, Cincinnati, OH, for American Elec. Power Service Corp., General American Transp. Corp., defendants.

Mark Alan Norman, Vorys Sater Seymour & Pease, Cincinnati, OH, for Ashland Oil, Inc., defendant.

Philip Joseph Schworer, Greenbaum Doll & McDonald, Cincinnati, OH, for Baker Iron & Metal Co., Inc., defendant.

Phillip Bruce Leslie, McBrayer McGinnis Leslie & Kirkland, Greenup, KY, for City of Flatwoods Mayor's Office, defendant.

Carl John Schmidt, III, Wood & Lamping, Cincinnati, OH, for Crounse Corp., defendant.

Robert Bowman Craig, Taft Stettinius & Hollister, Cincinnati, OH, Charles H Pangburn, III, Hemmer Spoor Pangburn DeFrank & Kasson PLLC, Ft Mitchell, KY, for David J. Joseph Co., defendant.

Thomas J Grever, Squire Sanders & Dempsey, Columbus, OH, for Gulf Chemical & Metallurgical Corp., defendant.

Jeffrey Joseph Harmon, Cors & Bassett, Cincinnati, OH, for Helm Financial Corp., defendant.

Jonathan P Saxton, Rendigs Fry Kiely & Dennis, Cincinnati, OH, for Ingram Industries, Inc., defendant.

Leigh Gross Johnson, Vanantwerp Monge Jones & Edwards, Ashland, KY, for Kentucky Elec. Steel, defendant.

Todd Matthew Powers, Schroeder Maundrell Barbiere & Powers, Cincinnati, OH, for Merdie Boggs & Sons, Superior Marine Ways, Inc., defendants.

Paul William Casper, Jr., Christopher S Habel, Frost & Jacobs, Cincinnati, OH, for Norfolk Southern Ry. Co., defendant.

Stanley Jerome Aronoff, Gregory Mohar, Aronoff, Rosen & Stockdale, Cincinnati, OH, for Nugent Sand Co., defendant.

Joseph Dominic Lonardo, Vorys Sater Seymour & Pease, Columbus, OH, for Ohio River Co., defendant.

Stephen Lounsbury Black, Graydon Head & Ritchey, Cincinnati, OH, for Progress Rail Services Corporations, defendant.

C Robert Schaub, Schaub Law Offices, L.C., Huntington, WV, for Ross Brothers Construction Co., defendant.

James Foley Brockman, Lindhorst & Dreidame, Cincinnati, OH, for Southpoint Barge Co., defendant.

## ORDER GRANTING PLAINTIFF'S MOTION TO ENTER CONSENT DECREES

DLOTT, District Judge.

This matter is before the Court on Plaintiff's Motion to Enter Consent Decrees (doc. 109). The four proposed partial Consent Decrees seek to resolve liability between the Plaintiff United States of America and four sets of Defendants (collectively referred to as the "Settling Parties") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), as amended by the Superfund Amendments and Reorganization Act of 1986 ("SARA"), 42 U.S.C. § 9601 et seq. The United States filed these consolidated suits to recover the costs expended by the United States Environmental Protection Agency ("EPA") in responding to environmental hazards at the Automatic Containers Superfund Site near the City of Ironton in Lawrence County, Ohio ("the Site"). Each of the following groups of Settling Parties are covered in one of the four proposed Consent Decrees: (1) Defendant Mansbach Realty Co. (d/b/a Mansbach Metal Co.) ("Mansbach") and the Third-Party Defendants known as the Mansbach Suppliers;[1] (2) Defendant Oak Hill

---

1. The Mansbach Suppliers include American Commercial Barge Line LLC; American Electric Power Service Corporation, Indiana Michigan Power Company, and Ohio Power

Company; Ashland Inc.; Baker Iron & Metal Co., Inc.; Merdie Boggs & Sons, Inc.; Crounse Corp.; CSX Transportation, Inc (in its own name and as successor to Louisville

Foundry & Machine Works, Inc. ("Oak Hill"); (3) Third–Party Defendant City of Ironton, Ohio ("City of Ironton"); and (4) Third–Party Defendants Crace Construction Company, Muth Lumber Company and Lawrence County Medical Center.

Amcast Industrial Corporation ("Amcast"), a non-settling Defendant and the Third–Party Plaintiff who filed claims against the Third–Party Defendants including the Mansbach Suppliers, has filed a Memorandum in Opposition to Plaintiff's Motion to Enter Consent Decrees (doc. 113). Several of the Settling Parties have filed briefs supporting the Motion to Enter the Consent Decrees. The Court has reviewed the parties' briefs and the voluminous supporting documents. Upon consideration of the law and the facts, Plaintiff's Motion to Enter Consent Decrees is hereby **GRANTED.**

## I. BACKGROUND

### A. Factual Background

The Site comprises 8.5 acres near Ironton, Ohio. It was used as a landfill until approximately September or October 1993 and it accepted residential, industrial, commercial, demolition, and municipal wastes during its period of operation. In September 1993, a fire began at the Site. Tests performed by the Portsmouth Local Air Agency demonstrated that various hazardous substances were being released. State and local officials were unable to extinguish the flames or control the smoke and gases being released. On October 13, 1993, Ohio Governor George Voinovich declared a state of emergency for Lawrence County, Ohio. The Ohio Environmental Protection Agency ("OEPA") requested intervention from the federal EPA.

The EPA mobilized at the Site on November 18–19, 1993. Officials performed additional tests on the conditions at the Site, such as air monitoring and water leaching. The tests showed that conditions at the site threatened the release of additional hazardous substances into the environment. Thus, the EPA began an emergency removal action.

The EPA's primary response activity was the construction of a clay cap over the burning landfill. The clay cover was intended to (1) suppress the release of airborne contaminants; (2) extinguish the fire; (3) reduce the risk of direct contact with the landfill wastes; and (4) minimize water-flow through the landfill. The installation of the clay cap and a final grade and restoration were completed in April 1994. The OEPA then adopted and independently implemented an operation and maintenance plan for the Site. According to that plan, OEPA was to monitor landfill temperatures, surface water quality, air quality in and around the Site, and gas emissions. The OEPA continued to provide monthly progress reports to the EPA.

By November 1994, landfill temperature testing indicated that the fire had been extinguished. EPA officials conducted a final inspection of the Site on November 2, 1994 with members from the OEPA, the technical assistance team, and various local agencies involved in the clean-up. After the final inspection, the EPA's involvement with the Lawrence County, Ohio Site was limited to enforcement actions. The OEPA took responsibility for maintaining the Site.

### B. Procedural Background

The United States filed a civil action, No. C–1–97–981, for the recovery of costs

and Nashville Railroad Co.).; E.I. Du Pont De Nemours and Company; General American Transportation Corp.; Helm Financial Corporation (on its own behalf and its related entities HM Joint Venture, Helm–Atlantice Associates Limited Partnership, and Helm–Pacific Leasing); Ingram Industries, Inc.; The David J. Joseph Co.; The Valley Line Company (formerly known as Mississippi Valley Barge Line); Norfolk Southern Railway Company; Nugent Sand Company; The Ohio River Company (and its related corporate entity Midland Enterprises Inc.); Progress Rail Services Corp.; Kentucky Electric Steel, Inc.; Ross Brothers Construction Co.; Sears, Roebuck and Co.; South Point Barge Co.; Superior Marine Inc.; and Union Tank Car Company.

under CERCLA, 42 U.S.C. § 9607, against Defendants Eddie Cantrell and Karen Cantrell on October 31, 1997. The Cantrells were alleged to be operators of portions of the Site when hazardous substances were disposed at the Site. The United States filed an Amended Complaint in case number C–1–97–981 on January 1, 1998 under the same CERCLA provision adding as Defendants (1) Mansbach Realty Co. d/b/a Mansbach Metal Co. ("Mansbach") and (2) Oak Hill Foundry and Machine Works, Inc. ("Oak Hill"). The Amended Complaint alleged that both Mansbach and Oak Hill were liable under § 9607 for arranging for disposal of hazardous substances at the Site.

The United States filed a second civil action, No. C–1–98–247, for the recovery of costs under CERCLA against Defendant Ohio Power Company ("Ohio Power") on April 1, 1998. Defendant Ohio Power was alleged to have arranged for the disposal of hazardous substances at the Site. The United States filed an Amended Complaint in case number C–1–98–247 on April 27, 1998 adding Amcast Industrial Corporation f/k/a Dayton Malleable, Inc. ("Amcast") as a Defendant. The Amended Complaint alleged that Amcast also arranged for disposal of hazardous substances at the Site.

After filing the second action, the United States moved the Court to consolidate case numbers C–1–97–981 and C–1–98–247. The Court consolidated the cases in its Case Management Order issued on October 7, 1998 and the subsequent filings in the consolidated cases have been under case number C–1–97–981.

Defendant Amcast has filed numerous cross-claim and third-party complaints. Defendant Amcast filed a Third–Party Complaint under CERCLA against ten Third–Party Defendants on June 16, 1998 alleging that each arranged for disposal of hazardous substances at the Site. Defendant Amcast filed a second Third–Party Complaint on April 13, 1999 against twenty seven Third–Party Defendants. Amcast alleged that the majority of these Third–Party Defendants sold metals and recyclables to Defendant Mansbach, some of which Mansbach later disposed of at the Site. This group of Third–Party Defendants has been referred to as the Mansbach Suppliers throughout this litigation. Amcast alleged that the metals and recyclables that the Mansbach Suppliers sold to Defendant Mansbach contained hazardous substances. Amcast alleged that the remaining Third–Party Defendants arranged for disposal of hazardous substances at the Site.

The majority of Defendants and Third–Party Defendants have attempted to enter into consent decrees with the United States and thus settle their claims. The Court has already entered unopposed Consent Decrees and granted motions dismissing several Third–Party Defendants. The Court has also granted a Motion for Partial Summary Judgment Against Defendant Amcast and held that Amcast is liable under CERCLA.

The Court turns its attention now to the Motion to Enter the Consent Decrees and Amcast's opposition to the Motion. The government would receive from the Settling Parties $715,000 of the unrecovered costs totaling $1,300,000 ("$1.3 million") if the Consent Decrees are entered. Under the proposed settlements, Mansbach and its Suppliers would pay $585,000 or 45% of the unrecovered $1.3 million; Oak Hill would pay $91,000 or 7% of the unrecovered $1.3 million; the City of Ironton would pay $26,000 or 2% of the unrecovered $1.3 million; and the Third–Party Defendants would pay $13,000 or 1% of the unrecovered $1.3 million. If the Consent Decrees are entered and if Amcast is required to pay the full amount of remaining unrecovered costs, Amcast would bear the same financial responsibility as Mansbach bears under the Consent Decrees: $585,000 or 45% of the currently remaining $1.3 million.

## II. ANALYSIS

The purpose of CERCLA is to facilitate the prompt remedial clean-up of hazardous

waste sites by assessing the costs of the cleanup to the persons found to be responsible for the presence of the hazardous substances. *See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999) (citing *United States v. R.W. Meyer*, 889 F.2d 1497, 1500 (6th Cir.1989)). Persons who can be found liable under CERCLA, sometimes referred to as potentially responsible parties ("PRPs"), include:

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a).[2] These arrangers "shall be liable" under CERCLA for "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A).

Any PRP who is liable or potentially liable under § 9607(a) may bring an action for contribution under 42 U.S.C. § 9613 against other PRPs it believes are responsible for the recovery costs. *See United States v. Township of Brighton*, 153 F.3d 307, 318 (6th Cir.1998). However, contribution claims cannot be filed against a PRP who has entered into a judicially-approved consent decree settling its CERCLA liability with the United States regarding matters addressed in the settlement. 42 U.S.C. § 9613(f)(2). The Court has already assessed liability under § 9607(a) against Defendant Amcast. The proposed Consent Decrees would have the effect of preventing Amcast from seeking contribution from any of the Settling Parties.

CERCLA specifically authorizes the President, or his representative agency, the EPA, to select remedies which will further efforts to remove hazardous substances and protect the environment. 42 U.S.C. § 9604. The statute specifically authorizes the President to enter into consent decrees with PRPs. 42 U.S.C. § 9622. The Court has the duty to ensure that the proposed settlement is "fair, reasonable, and consistent with the purposes that CERCLA is intended to serve" before entering the Consent Decrees. *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1424 (6th Cir.1991). The general policy of the law is to support voluntary settlements. That policy is heightened in situations where PRPs enter into consent decrees with the EPA because "the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir.1990); *see also United States v. Wallace*, 893 F.Supp. 627, 631 (N.D.Tex.1995) ("Approval by state and federal agencies which are charged with the implementation and review of the various environmental statutes carries with it a strong presumption of the validity of the proposed consent decree.").

In reviewing the proposed Decrees, the Court does not engage in a de novo review of the evidence. *See Akzo Coatings*, 949 F.2d at 1424. That is, the Court does not "make a finding of fact as to whether the settlement figure is exactly proportionate to the share of liability appropriately attributed to the settling parties." *United States v. Rohm & Haas Co.*, 721 F.Supp. 666, 680 (D.N.J.1989). But the Court also must do more than mechanically rubberstamp the proposed settlements. *See Akzo Coatings*, 949 F.2d at 1424 (citing *Cannons Eng'g Corp.*, 899 F.2d at 84). The court's review must be "thorough and penetrating." *See id.* The Court must perform a searching review of the evidence and determine if the settlements represent a reasonable compromise. *See Rohm & Haas Co.*, 721 F.Supp. at 680.

---

**2.** Other categories of PRPs under § 9607(a) are owners and operators of facilities and persons who transport hazardous substances to facilities.

The Court must ensure that the proposed Consent Decrees are not "arbitrary, capricious, and devoid of a rational basis." *United States v. BASF Corp.*, 990 F.Supp. 907, 910 (E.D.Mich.1998) (quoting *Cannons Eng'g Corp.*, 899 F.2d at 87).

## A. Procedural Fairness

▪ Procedural fairness is one aspect of a settlement that is reasonable, fair, and consistent with CERCLA. The Court must determine that the negotiators bargained in good faith. *See Kelley v. Thomas Solvent Co.*, 717 F.Supp. 507, 517 (W.D.Mich.1989). The Court should gauge the candor, openness, and bargaining balance of the negotiations. *See Cannons Eng'g Corp.*, 899 F.2d at 86; *Wallace*, 893 F.Supp. at 632. The United States asserts, without any specific evidentiary basis, that Amcast was offered multiple opportunities to participate in settlement discussions and that the proposed Consent Decrees are the result of armslength bargaining.

Amcast's argues that the settlements were reached without procedural fairness on two grounds. The first ground is that the United States has refused to produce its underlying response costs documents. Amcast contends, as it did in its opposition to the United States' Motion for Partial Summary Judgment against Amcast on the issue of liability, that the underlying costs documentation would shed light on the issue of which PRP's waste disposals caused the harm at the Site. The United States has not produced the underlying costs documentation, but it has produced significant discovery related to costs expended at the Site.

▪ The United States has produced (1) an Itemized Costs Summary outlining all EPA expenditures at the Site for a several year period including 1993 and 1994; (2) reports of indirect costs related to the Site for the relevant years including travel, shipping purchases, state assistance programs, and contractor costs; (3) the names of employees of the EPA, the OEPA, other state agencies, and various contractors who would have information regarding the conditions at the Site and actions taken in response to conditions at the Site; and (4) EPA Pollution Reports produced contemporaneously during the several months of Site clean-up detailing estimates of costs incurred. Additionally, for the reasons discussed at length in the Order Granting Plaintiff's Motion for Partial Summary Judgment Against Defendant Amcast, the Court does not believe the underlying costs documentation would provide evidence as to which PRP's waste caused the fire or the release of hazardous materials. The Court finds, therefore, that to the extent the recovery costs documentation could be relevant to the issue of procedural fairness, the United States has provided adequate discovery to Amcast regarding the recovery costs.

Contrary to Amcast's assertions, *United States v. Shane*, No. C–3–89–383, slip. op (S.D.Ohio Jan. 27, 1999), does not compel a different result. The issue in *Shane* was the opposition of RSR Corporation, a potentially responsible party, to the entering of a consent decree between the government and Shane, the operator of the hazardous waste site. Shane was required to pay only $354,112 under the proposed consent decree, due to its allegedly limited financial resources. Three other defendants, including RSR Corporation were left to share the burden of the remaining $6,000,000. *See id.* slip op. at 12. RSR Corporation argued that the consent decrees should be denied until it had a chance to conduct more discovery regarding Shane's financial situation. *See id.* slip op. at 8 n. 15. RSR Corporation contended that additional discovery would reveal that Shane had greater financial resources than the government believed, and therefore, would be able to bear a significantly higher portion of the unrecovered costs. *See id.* slip op. at 8–12. Chief Judge Rice ordered that additional limited discovery regarding the issue of Shane's financial circumstances would be allowed. *See id.* slip op. at 12.

The rationale in *Shane* for allowing discovery before deciding whether to enter

the consent decree is not applicable here. Amcast does not seek the underlying costs documentation in order to prove that the United States erroneously underestimated a Settling Party's ability to pay damages. Amcast seeks the costs documentation to prove that the Settling Parties' liability should be proportionally greater. The parties have had a full opportunity under the bifurcated discovery plan in the Case Management Order to obtain liability-related discovery. Again, the Court does not believe that underlying costs documentation, including receipts and invoices for the work performed, would aid in a determination of proportional liability. *Shane,* therefore, is distinguishable and the proposed Consent Decrees are not procedurally unfair because the United States has not produced the underlying costs documentation.

Amcast's second grounds for arguing procedural unfairness is that the United States did not indicate its calculation that the Site contained approximately 400,000 tons of wastes until its Reply Memorandum in Support of Motion to Enter Consent Decrees filed on November 1, 1999. Instead, the United States gave this proportional table of volumetric contribution which it used to calculate the settlement allocations for each PRP:

| | Approximate Waste Volume | Waste Toxicity | Allocated Shares | Settlement Shares | Remaining Shares |
|---|---|---|---|---|---|
| **Amcast** | More than 30,000 tons | Low to moderate | 40%–50% | — | 45% or $585K |
| **Mansbach and its Suppliers** | More than 30,000 tons | Very low to moderate | 40%–50% | 45% or $585K | |
| **Oak Hill** | 4,500 to 7,500 tons | Low | 5% to 10% | 7% or $91K | |
| **City of Ironton** | 1,250 to 2,500 tons | Very low | Less than 2% | 2% or $26K | |
| **Other Third–Party Settlers** | Less than 75 | Very low | Less than 1% | 1% or $13K | |
| **TOTALS** | | | | 55% or $715K | 45% or $585K |

The 400,000 tons estimate of the total volume of wastes at the Site is important because, as will be discussed in more detail below, it renders implausible Amcast's estimate that Mansbach and its Suppliers were responsible for disposing of upwards of 2,000,000 tons of waste at the Site.

Amcast specifically requested in an Interrogatory that the United States reveal the total volume and weight of the waste at the Site and identify the persons and documents that have information with regard to the same. The United States responded in relevant part:

> [T]he United States responds that it lacks precise information regarding the total volume and weight of waste at the Site, and knows of no person or documents that have precise information with respect to the total volume and weight of waste at the Site. Based on

estimates, the United States is informed and believes that several hundred thousand cubic yards of waste material may be located at the Site.

Exhibit A attached to Defendant Amcast's Surreply (doc. 120). The United States never amended nor supplemented its answer. Only in an exhibit attached to the United States' Reply Memorandum in Support of the Motion to Enter the Consent Decrees (doc. 115) did Ralph Dollhopf, one of the EPA's on-site coordinators, explain how the United States reached the 400,000 tons estimate using Site maps and Pollution Reports made available in discovery, as well as a volume-to-mass conversion factor available at 40 C.F.R. Part 300, App. A, Table 2–5 (1998).

The Court shares Amcast's concerns that the United States was less than forthcoming in failing to fully answer the Inter-

rogatory or provide a supplemental response. The issue, however, is whether the failure to fully disclose the tonnage of waste at the Site made the settlement negotiations procedurally unfair. Presumably Amcast would not have argued to the Court that Mansbach disposed of 2,000,000 tons or more of waste at the Site if it was explicitly informed of the 400,000 tons total estimate. Nonetheless, the Court would have found Amcast's arguments regarding Mansbach's disposal improbable based solely on the less precise "several hundred thousand" estimate given in the Interrogatory response. Moreover, Amcast's calculation ignores substantial evidence that Mansbach did not dispose of wastes at the Site during all of the years of operation or in the quantity that Amcast uses in its 2,000,000 tons calculations. Amcast's arguments that the settlement is substantively unfair which concern the 400,000 tons total waste calculation will be discussed below in the section on substantive fairness.

## B. Substantive Fairness

Turning to the issue of substantive fairness, the Court will first address a thematic objection Amcast makes to the proposed settlement allocation and then address its specific objections.

The United States based its settlement allocations on the volume and toxicity of the wastes each party disposed of at the Site. A theme running through many of Amcast's individual arguments is that the combustibility and flammability of the waste should have been included in the United States' calculation of settlement shares. The United States argues in response that its focus on toxicity is consistent with CERCLA.

CERCLA imposes liability pursuant to 42 U.S.C. § 9607(a) against PRPs who transported hazardous substances or arranged for the transportation of hazardous substances to a site at which a release or threatened release of a hazardous substance occurred causing the United States to incur costs. *See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171

F.3d at 1068; *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348 (6th Cir.1998). Liability is not triggered based upon the combustibility of the wastes. The United States involvement at the Site, moreover, was triggered because of the release and threatened release of hazardous materials at the Site. The December 2, 1993 Action Memorandum seeking spending authority to abate the threat at the Site stated that the Site presented a threat to public health because hazardous substances were being released and were migrating from the Site in the smoke emissions. The removal action was expressly intended to mitigate the release.

Additionally, Courts are not to substitute their judgment for what is the best measure of culpability in examining proposed consent decrees.

It appears very clear to us that what constitutes the best measure of comparative fault at a particular Superfund site under particular factual circumstances should be largely left to the EPA's expertise. Whatever formula or scheme EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs.

*Cannons Eng'g Corp.*, 899 F.2d at 87. Other courts have agreed with this assessment. *Kelley v. A.T. Wagner*, 930 F.Supp. 293, 298 (E.D.Mich.1996) (stating that "a CERCLA settlement must be based upon and roughly correlated to an acceptable measure of comparative fault, apportioning liability among PRPs according to rational estimates of fault."); *Arizona v. Nucor Corp.*, 825 F.Supp. 1452, 1459 (D.Ariz. 1992) (stating that the Court's role "is not to determine the best method for measuring fault and determining liability").

Therefore, bearing in mind that CERCLA's focus is on the release of hazardous wastes and not combustibility, and

that the Court is not to substitute its judgment for that the EPA, the Court cannot state that the formula allocating responsibility using volume and toxicity alone is not plausible.

The Court next will proceed by examining the volume and toxicity of the waste Amcast and each of the four groups of Settling Parties deposited at the Site. Amcast's objections to the Consent Decree and the response of the United States and the Settling Parties will be incorporated where appropriate.

### 1. Amcast

The Court will begin by looking at Amcast, a non-settling party, because consent decrees must be fair to non-settlers as well as to the settling parties. *United States v. Kramer*, 19 F.Supp.2d 273, 285 (D.N.J. 1998); *A.T. Wagner*, 930 F.Supp. at 297. Amcast objects to the proposed Consent Decrees because it believes that it should not bear 45% of the remaining unrecovered response costs. One of its primary arguments is that its wastes were not hazardous and did not contribute to the fire at the Site. In 1978 and 1979 Amcast disposed of more than 30,000 tons of waste comprised primarily of spent foundry sands.[3] All available evidence indicates that the foundry sands contained minuscule amounts of one or more of the following substances identified as hazardous by CERCLA: arsenic, cadmium, lead, furan, phenol, toluene, naphthelene, ethylbenzene, m-xlene, o-xlyne, and p-xlene. Testing at the Site at the time of the fire revealed that some of these same substances were being released into the environment.[4]

Amcast wastes also included 1,000 tons or greater of calcium carbide slag. The calcium carbide slag constituted a hazardous substance at the time it was generated because it was reactive and ignitable when exposed to water. The slag produces acetylene gas when exposed to water. The slag also contained at least minimal amounts of substances such as arsenic, barium, chromium, and selenium.

Amcast officials testified that the slag was treated with moisture before it was disposed of at the Site rendering it nonreactive and non-ignitable, but the United States has presented evidence which casts doubt on the assertions that the slag was treated. Dennis Bertram averred that Amcast treated the slag, but he could not remember what treatment procedure was used when he was deposed; a report cited by Amcast as proof that the slag was treated did not mention any treatment; and at least one truckload of slag caught fire on its way to the Site. Amcast also points to a 1989 study at the Site which concluded that no fire hazard existed at the Site as evidence that its wastes deposited in the late 1970's could not have caused the fire. The United States does not refute the study, but refers the Court to its preliminary response reports drafted upon the EPA's arrival at the Site after the fire began. In these initial reports from the Site, the EPA expressed its immediate concern that Amcast had dumped foundry sands and calcium carbide slag at the Site.

Finally, Amcast asserts that it should not be left responsible for the remaining 45% of the $1.3 million in unrecovered costs because the wastes it disposed of did not burn in the fire. Amcast asserts that it disposed of its wastes on the eastern portion of the Site. The undisputed evi-

---

**3.** The government estimates that Amcast may have deposited between 63,000 and 89,000 tons of waste, but it has based the allocated share on a finding of only "more than 30,000 tons."

**4.** Amcast also objects that spent foundry sands have scientifically recognized beneficial uses at a landfill. An Ohio EPA policy states that under certain conditions spent foundry sands may be used as a daily cover at a landfill and that sands can be used to extinguish fires. However, Amcast presents no evidence that the Ohio EPA conditions were met. There is evidence, moreover, that the spent foundry sand was co-mingled with sludges from paint, from pollution control equipment, and from oil quench baths.

dence indicates that the fire burned on only three of the eight and one-half acres on the northern and western portions of the Site. Amcast based its conclusion on the deposition testimony of Floyd Lewis, a truck driver who hauled wastes to the Site, and a map drawn during the Bobbie Proffitt deposition. The map and Lewis' testimony based upon the map purport to indicate the portions of the Site at which Amcast disposed of its wastes. The map is flawed, however, in that during the Proffitt deposition the attorney drew an inaccurate north-indicating arrow. The map indicates that State Route 141 runs east and west, but all credible evidence establishes that State Route 141 runs north and south along the eastern side of the landfill. When the map is reoriented, the area where Amcast appears to have disposed of its wastes is the north-western portion of the Site, not the north-eastern.

In sum, the evidence indicates that Amcast has consistently objected to being treated as one of the primarily responsible parties for the fire and the release of hazardous substances at the Site. The United States has heard these objections, but rejected the factual assertions behind them. In a similar consent decree decision, one court had the following to say about the lone objector's arguments in opposition to entering the consent decree:

> Sun's objection then boils down to its belief that the allocated share assigned to it through the process was too high, because Sun does not credit the underlying facts and assumptions. It is the nature of the allocation process that reasonable parties may disagree about the facts and assumptions underlying the assigned shares.... Although Sun is the only party to object to the allocation process, one suspects that many settling parties also may believe they are being asked to pay too much, given other plausible views of their potential liability. It suffices to say that the process took all known facts into account, including Sun's proposed facts, weighed them, entertained Sun's objections, and gave Sun a plausible explanation for its proposed

settlement allocation, all as revealed in Sun's own submissions. Sun disagrees and exercises its right to refrain from settlement on the proposed terms. This is not prejudicial nor is it unfair to Sun. *United States v. Kramer,* 19 F.Supp.2d at 281–82 (citations and footnotes omitted). In the same way, it is clear that this the United States was aware of Amcast's objections when it moved the Court to enter the Consent Decrees.

The role of the Court is not to determine the best allocation method, but rather to determine that the United States' method was plausible. *See Cannons Eng'g Corp.,* 899 F.2d at 87; *see also A.T. Wagner,* 930 F.Supp. at 298 (stating that the settlement must be "reasonable"). The settlement allocation for Amcast based on the United States finding of volume and toxicity is plausible. Additionally, the CERCLA statutory scheme as amended by SARA creates a framework where non-settling PRPs risk bearing a disproportionate amount of liability. *See Cannons Eng'g Corp.,* 899 F.2d at 91; *see also, BASF Corp.,* 990 F.Supp. at 912. This framework "encourage[s] parties to settle early with United States and discourage[s] dilatory and strategic behavior." *See BASF Corp.,* 990 F.Supp. at 912.

Moreover, it is inappropriate at this stage in the litigation for the Court to make final determinations of the divisibility of harm and what percentage of liability is to be assigned to each PRP. That is what Amcast seeks the Court to do in its arguments discussed above and in its citation to a recent opinion of Chief Judge Walter H. Rice in *AlliedSignal, Inc. v. Amcast Int'l Corp.,* C–3–92–013, slip op. (S.D.Ohio Sept. 10, 1999). In that case, AlliedSignal filed an action for contribution under CERCLA against Amcast seeking to impose a significant portion of its liability on Amcast. Chief Judge Rice indicated in the abbreviated opinion that Amcast was only to be held liable for 2% of the response costs, except for the costs associated with the cap for which Amcast would

be liable for 28% of the costs. *See id.* slip op. at 3.

The *AlliedSignal* opinion is readily distinguishable from the case at bar and does not support Amcast's arguments here. First and most importantly, the procedural posture is different. Chief Judge Rice was making final determinations of liability and the percentage of damages in an action for contribution under CERCLA. The Court's only task here is to determine if a proposed Consent decree is reasonable and plausible. Another court gave an appropriate rejoinder to Amcast's concerns that the proposed Consent Decrees do not apportion monetary liability between the PRPs in the proportions that a trial on the merits might yield:

> The decree by no means embodies a perfect settlement. There is a real risk that the dollar figure is disproportionate to the volumetric shares of the settlors, and thereby, of significant prejudice to the non-settling defendants. At the same time, however, the settlement is a reasonable and fair compromise. There remains, after much discovery, much uncertainty as to the volumetric share and, indeed, the liability of some of the settlors. The volumetric share and concomitant dollar sum which underlie this settlement do, it seems to us, reside comfortably within the plausible parameters of those settlors' potential equitable liability, be it high or low.

*Rohm & Haas Co.*, 721 F.Supp. at 696. The same can be said about the uncertainty of the volume and toxicity of the wastes at the Site, but the Court draws the same conclusion about the fairness of the proposed Consent Decrees.

Second, the September 10, 1999 *AlliedSignal* opinion is abbreviated and does not provide explanation for its allocation of costs. The Court cannot use this opinion as even persuasive precedent without an understanding of the underlying facts and the rationale behind Judge Rice's opinion. Moreover, determinations of liability pursuant to CERCLA are highly fact specific. The fact that Amcast's proportional liability for its disposal of foundry sand may lead to relatively lesser liability at one hazardous site does not imply that its liability would be analogous at a different hazardous site.

In conclusion, the Court holds that the share of response costs allocated to Amcast pursuant to the proposed Consent Decrees is both plausible and substantively fair.

### 2. Mansbach and the Mansbach Suppliers

Under the proposed Consent Decrees, Mansbach and its Suppliers would be responsible for paying $585,000 or 45% of the remaining $1.3 million of unrecovered response costs. Mansbach and its Suppliers are held responsible for disposing of more than 30,000 tons of waste with a very low to moderate level of toxicity. The Suppliers' waste is a subset of the total wastes Mansbach deposited at the Site. The Court therefore will use the term "Mansbach" to refer to both Mansbach and its Suppliers.

Amcast objects that Mansbach's share of the unrecovered costs should be greater than its own because Mansbach disposed of a significantly greater volume of waste. Amcast's argument is the result of a mathematical calculation that Mansbach hauled 15 loads daily of 25 tons of waste per truck for six days per week from at least April 1975 through September 1993. The result the calculation yields—that Mansbach disposed of as much as 2,029,500 tons of waste at the Site—is implausible because, as was discussed above, the Site was estimated to contain only 400,000 tons of waste. The Court will nonetheless consider whether the "more than 30,000 tons" attributed to Mansbach under the proposed settlements is implausibly low.

The United States admits in its briefs that the evidence can be read as reflecting that Mansbach disposed of as much as 33,860 tons of "yard dirt" and "barge dirt" at the Site between August 1990 and September 1993. The evidence can also be

730

fairly read to indicate that in the late 1970s or early 1980s Mansbach disposed of much smaller quantities of "shredder dirt" along with "yard dirt" at the Site. Yard dirt and barge dirt consist largely of the dirt and wood waste scraped from the bottom of river barges and railroad cars. Shredder dirt consists of the non-metallic residue from shredded automobiles and appliances. Amcast does not dispute the very low to moderate toxicity rating the Consent Decrees assign to Mansbach's wastes, but it does emphasize that Mansbach's wastes were flammable.

Amcast's primary objection regarding Mansbach arises from a dispute in the evidence regarding the quantity of wastes Amcast deposited before the years of 1990 until 1993. Bearing in mind that the United States' calculations need only be plausible, there is strong evidence in the record indicating that Mansbach ceased disposing of its wastes at the Site in favor of another landfill for a period of time in the 1980s. There is also evidence indicating that the amounts Mansbach disposed of at the Site in the 1990s would be substantially greater than the amounts it disposed of during its first period of use in the late 1970s and early 1980s because Mansbach's business increased substantially over time.

 Therefore, although an estimate of "more than 30,000 tons" disposed of is probably low, it is not an implausible or substantively unfair calculation. In making this conclusion, the Court notes that Amcast's estimated volume was also calculated at "more than 30,000 tons" even though evidence indicates that Amcast disposed of between 63,000 and 89,000 tons of waste. Additionally, Mansbach is assigned a 45% settlement share of the unrecovered costs under the proposed Consent Decrees for its "more than 30,000 tons" and Amcast is imputed with 45% share of the unrecovered costs for its "more than 30,000 tons" even though the United States believes Amcast's wastes to be of a greater toxicity.

### 3. Oak Hill

The proposed Consent Decrees hold Oak Hill liable for disposing of between 4,500 and 7,500 tons of waste with a low toxicity. These figures resulted in a settlement share of 7% or $91,000. Amcast does not specifically refute these calculations. The Court finds that the calculations of Oak Hill's settlement share are substantively reasonable.

### 4. City of Ironton

The City of Ironton is held responsible for disposing of 1,250 to 2,500 tons of very low toxicity wastes. The City of Ironton's settlement share is 2% or $26,000. The United States bases its volume estimates on deposits during the years 1987–1993. The City used its records to calculate the 1,250 tons estimate. The United States doubled the amount to take into account the possibility of missing records. Nonetheless, Amcast argues the volume estimate is too low because the United States' estimate does not account for all of the years the City used the Site.

Amcast cites the deposition of a City truck driver, Larry Fraley, as evidence that the City began disposing of its waste at the Site as early as 1983. Fraley also testified that the City hauled waste to the Hanging Rock Landfill before switching to the Site, but when questioned more specifically he could not remember when the City switched landfills. Charles Kouns, the City Health Commissioner during the relevant time period, testified that the City allowed its residents to use the Site for dumping from 1980 until 1993, but he also testified that he could not be sure of the dates.

William Sheridan, the Mayor of the City of Ironton during the 1980's, directly contradicted Kouns' testimony. Sheridan testified in his deposition that Kouns was wrong to the extent he believed the City allowed residents to dump at the Site prior to 1987. He testified that before 1987, citizens of the City of Ironton were told they could dispose of demolition waste and

yard waste at the Hanging Rock Landfill. Sheridan's testimony is supported by City of Ironton records including a 1986 letter renewing a 1984 contract between the City and the Hanging Rock Landfill and financial records indicating payment from the City to the Site beginning in September 1987.

In sum, while there is testimony indicating that the City may have disposed of waste at the Site prior to 1987, the weight of the evidence supports the United States' contention that City's disposal did not begin until 1987. The proposed Consent Decrees, therefore, cannot be said to be "arbitrary, capricious, or devoid of rational basis" in calculating the volume of the City's disposal as beginning in 1987. *See BASF Corp.*, 990 F.Supp. at 910 (quoting *Cannons Eng'g Corp.*, 899 F.2d at 87). The volumetric share attributed to the City accounts for the fact that the City's records may be incomplete by doubling the City's estimate of 1,250 tons. The proposed Decrees are not substantively unfair in assigning only 2% of the unrecovered costs to the City.

### 5. Third–Party Settlers

The other Third–Party Settlers are held responsible for disposing of less than 75 tons of very low toxicity wastes. They are consequently assigned 1% of the remaining costs, or $13,000. Amcast does not directly dispute the volume or toxicity of the wastes the Third–Party Settlers disposed of, but it emphasizes that the wastes were highly combustible. The Court, however, already has rejected Amcast's arguments that the settlement allocations of responsibility and cost are substantively unfair because the allocation formula does not consider the combustibility of the wastes. Accordingly, the proposed Consent Decrees are substantively fair in the proportion of costs they assign to the Third–Party Settlers.

### 6. Final Calculations

Before leaving the question of procedural fairness, the Court will address Amcast's arguments that the final calculation of the settlement shares is not fair because Amcast is held responsible for a disproportionate share when the 400,000 tons of total waste at the Site is considered. Amcast contends that if it disposed of 30,000 tons of waste at the Site, the tonnage attributed to Amcast in the proposed settlements, then it should be proportionally responsible for only 8% of the response costs.[5] Even the United States' highest estimate of Amcast's disposal of wastes at the Site—89,760 tons—yields only a 22% share of the response costs.[6] The Consent Decrees, however, would hold Amcast responsible for the remaining 45% of the unrecovered response costs.

Amcast's argument fails because it overlooks two key facts. First, the United States' calculation is based on both volumetric disposal and the toxicity of the wastes disposed of. Second, each of the PRPs' percentage of volumetric contribution is a lesser amount than their allocated share under the proposed Consent Decrees. Under the proposed Decrees, Mansbach and its Suppliers are held responsible for contributing the same 8% of the wastes at the Site as Amcast, and yet it is allocated the same 45% of the recovery costs as Amcast. Oak Hill is estimated to have disposed of 4,500 tons to 7,500 tons of waste which amounts to 1.125% to 1.875% of the total of 400,000 tons. Oak Hill, nonetheless, is allocated a much more substantial 7% share of the recovery costs under the Consent Decrees. Similarly, the City of Ironton contributed only 0.313% to 0.625% of the waste, yet its share of the recovery costs is 2%. The Third–Party Settlers contributed a mere 0.0188% of the waste at the Site, yet their share is 1%. These figures lead to the conclusion that the proposed Consent Decrees cannot be considered substantively unfair or arbi-

---

5. 30,000 tons is 8% of the total of 400,000 tons.

6. 89,760 tons is 22% of the total of 400,000 tons.

trary because Amcast may be held liable for a larger percentage of the recovery costs than its percentage of contribution to the total amount of wastes at the Site.

### C. Reasonableness

The settlements under the proposed Consent Decrees must also be reasonable. One factor of reasonableness is whether the settlements adequately compensate the public for the actual removal costs. *See Cannons Eng'g Corp.*, 899 F.2d at 90; *BASF Corp.*, 990 F.Supp. at 913. The United States expended $1.525 million in performing the removal action at the Site. After taking account of settlements which have already been reached, the United States is seeking to recover the remaining amount of $1.3 million. The proposed Consent Decrees would yield payments from the Settling Parties of $715,000, representing 47% of the total recovery costs of $1.525 million and 55% of the remaining $1.3 million.

The Court must consider factors other than the percentage of unrecovered costs gained in the Decrees. First, the Court must consider the foreseeable risk of loss if the United States had to fully litigate its position against each Settling Party as well as Amcast. *See Kramer*, 19 F.Supp.2d at 287; *BASF Corp.*, 990 F.Supp. at 913. The United States potentially is saving hundreds of thousands of dollars in further litigation costs and is guaranteeing a recovery of a significant amount of the costs expended. Second, the Court already has held that Amcast is liable under CERCLA, 42 U.S.C. § 9607(a). Amcast will have a chance to circumvent that finding of liability during the later damages portion of the litigation,[7] but it is reasonable to believe that the United States will recover a sub- stantial portion of the $585,000 allocated to Amcast under the proposed settlements.

### D. Consistency with CERCLA

Congress had two main objections in enacting CERCLA and the SARA amendments: "ensuring prompt effective remedial action while placing the financial burden of the cleanup on the PRPs." *Akzo Coatings*, 949 F.2d at 1439. The focus on this case is in recovering the past costs the United States expended in cleaning up the Site in 1993 and 1994. Moneys received pursuant to consent decrees replenish the CERCLA Superfund and enable the United States to undertake necessary remedial actions at other hazardous sites. *See Kramer*, 19 F.Supp.2d at 289.

The Consent Decrees here are consistent with CERCLA in that they enable the United States to receive more than half of the $1.3 million of the unrecovered costs without enduring additional risks and litigation costs. Early settlements with PRPs are cost effective and "preserve precious resources of the government in their efforts to clean up waste sites as quickly and cheaply as possible." *See Thomas Solvent Co.*, 717 F.Supp. at 518. Finally, the fact that Amcast may be left responsible for a disproportionate share of the unrecovered $1.3 million does not frustrate the goals of CERCLA. The threat of disproportionate liability was contemplated by CERCLA to encourage settlement and discourage "dilatory and strategic behavior." *BASF Corp.*, 990 F.Supp. at 912.

### III. CONCLUSION

For the reasons stated above, the Court holds that the proposed Consent Decrees assigning Mansbach and its Suppliers 45%

---

7. In exceptional circumstances, a PRP may be able to establish that harm at the hazardous waste site is divisible under traditional and evolving principals of common law. If the PRP can establish that the harm is divisible, and the PRP can further establish that it is not responsible for any of the harm at the site, then the PRP has effectively established its share of the damages to be $0. *Township of Brighton*, 153 F.3d at 318. Any defendant PRP seeking to establish zero damages and in effect zero liability faces an extremely difficult road. "Given the nature of hazardous waste disposal, rarely if ever will a PRP be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm." *Centerior Serv. Co.*, 153 F.3d at 348.

of the unrecovered response costs, Oak Hill 7% of the unrecovered response costs, the City of Ironton 2% unrecovered response costs, and other Third–Party Settlers 1% unrecovered response costs is fair, reasonable, and consistent with the purposes CERCLA is intended to serve. Plaintiff's Motion to Enter Consent Decrees (doc. 109) is hereby **GRANTED.**

 **IT IS SO ORDERED.**